IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION



STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

PLAINTIFF,

v.   CIVIL CASE NO. 4:09CV47

JOHN A. ROBINS,
VIRGINIA FARM BUREAU MUTUAL
INSURANCE COMPANY,
NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY, and
STEVEN IVEY,

DEFENDANTS.

## OPINION AND ORDER

On January 5, 2010, the Court held a hearing on Plaintiff State Farm Mutual Automobile Insurance Company's ("State Farm") Motion for Summary Judgment, Doc. 23, and on Defendant Nationwide Mutual Fire Insurance Company's ("Nationwide") Motion for Summary Judgment, Doc. 26. At the conclusion of the hearing the Court indicated that it would take the matter under advisement. The Court has since conducted further analysis of the issues and reached a decision, which is set forth below.

### I. PROCEDURAL HISTORY

State Farm filed the present action for declaratory judgment on May 7, 2009. Doc. 1. The Complaint invokes this Court's diversity jurisdiction. Id. Defendants Virginia Farm Bureau Mutual Insurance Company ("Farm Bureau"), Nationwide, and Steven Ivey ("Ivey") filed

1

answers on June 10, 2009. Docs. 6, 7, and 8. With the Court's permission, Nationwide filed an Amended Answer on December 22, 2009. Doc. 33. Defendant John A. Robins ("Robins") never filed an answer; however, no party has sought default judgment against Robins, and State Farm filed a status report on June 16, 2009 indicating that this dispute is mainly among the insurance companies and that it would not seek default judgment against Robins.

On December 14, 2009, the parties filed an extensive Joint Stipulation of Facts. Doc. 22. Plaintiff State Farm filed a Motion for Summary Judgment and supporting memorandum the same day. Docs. 23 and 24. On December 17, 2009, Defendant Nationwide also filed a motion for summary judgment and supporting memorandum. Docs. 26 and 27. Ivey, Farm Bureau, and State Farm each filed responses to Nationwide's summary judgment motion on December 21, 2009. Docs. 30, 31, and 32. Nationwide filed rebuttal briefs on December 23, 2009. Docs. 34 and 35.

The Court entered a final pre-trial order on December 21, 2009. Doc. 29. A hearing on the parties' motions was held on January 5, 2010, in lieu of trial, and the Court took the matter under advisement. See Doc. 38.

## II. FACTUAL BACKGROUND

For purposes of this declaratory judgment action, the parties (except Defendant Robins, who has not entered any pleadings in this matter) stipulate the following facts:

State Farm is an Illinois citizen for diversity purposes, though it is licensed to do business in Virginia. Doc. 22 at 1. Defendants Robins and Ivey are individual citizens of Virginia, and Defendant Farm Bureau is also a citizen of Virginia. Id. at 1–2. Defendant Nationwide is an Ohio citizen, also licensed to do business in Virginia. Id. at 2.

On Sunday, August 17, 2008, a fire caused approximately two hundred ninety-two thousand, eight hundred fifty dollars ($292,850.00) in damage to Defendant Ivey's residential property, a house that was under construction and vacant. Id. A box van owned by Defendant Robins was also destroyed in the fire. Id. at 3. Robins, a carpenter and the sole proprietor of JAR Custom Building and Remodeling, had been using the van to store his tools while he worked on the house, as he had done with previous construction projects. Id. Each day upon arrival at the site, Robins would unlock the van and open the cargo door to gain access to his tools and equipment; upon leaving, he would replace the tools, close the cargo door, and secure it with a padlock. Id. at 3–4. The tools and other pieces of equipment that Robins kept in the van were not attached to the van. Id. at 4. Robins last accessed the van on Friday, August 15, 2008; due to bad weather that afternoon, he locked the van and left the site around 3:30 p.m. Id. at 4.

The cause of the fire was investigated by three individuals, each of whom is stipulated to be qualified to render the findings and opinions in their reports. Id. at 4–5. The parties further stipulate that these individuals' opinions were expressed within a reasonable degree of probability or certainty, and that each report is admissible into evidence "for purposes of the instant proceeding." Id. at 5. The first report (the "Austin report"), prepared by Herbert Austin of Gloucester Volunteer Fire and Rescue, concludes that the fire originated in the rear of the van, and that "the material first ignited is most probably the wiring insulation and light combustible materials in the rear of the van." Id. Ex. 3. The Austin report was prepared at the request of the fire chief of Gloucester Volunteer Fire and Rescue. Id. Kenneth Riddleberger, of Double 'K' Inc., prepared the second report (the "Riddleberger report") at the behest of State Farm; his report concludes that the fire originated in the rear of the cargo area, and although he rules out the van as the cause of the fire, he nevertheless states that the actual cause remains undetermined.

Id. Ex. 4. The third report (the "Crim report") was requested by Farm Bureau and prepared by Charles Crim of Froehling & Robertson, Inc. Id. Ex. 5. Crim concludes that the fire started in the rear of the van, was electrical in origin, and was caused by the failure of an extension cord running from a power source to an electrical splitter within the van, or by the failure of a DeWalt battery charger that was plugged into the splitter. Id.

Since the fire, Farm Bureau has paid the cost of the fire damage—approximately two hundred ninety-two thousand eight hundred fifty dollars ($292,850.00)—pursuant to a homeowner's insurance policy held by Ivey. Id. at 2. Farm Bureau claims subrogation rights against Robins, contending that the fire and resulting damages were the proximate result of Robins' negligence.[1] Id. At the time of the fire, Robins was the named insured on a Commercial General Liability policy issued by Nationwide; Robins promptly notified Nationwide of the fire and of Farm Bureau's claim, and Nationwide denied liability coverage on August 29, 2008, citing an exclusion clause in Robins' policy. Id. at 5–6. Robins was also the named insured under a Business Auto policy issued by State Farm, which notified Robins on August 19, 2008 that it was reserving its right to deny liability coverage. Id. at 6.

### III. STANDARD OF REVIEW

Summary judgment is only appropriate when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986). As the parties have stipulated the facts in this case, only legal issues remain to be decided.

---

[1] Although Farm Bureau claims subrogation rights based on Robins' alleged negligence, no party has made Robins' alleged negligence an issue in this action for declaratory judgment.

## IV. BURDEN OF PROOF

The moving party on a summary judgment motion has the initial burden to show the absence of an essential element of the nonmoving party's case and to demonstrate that the moving party is entitled to judgment as a matter of law. Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 185 (4th Cir. 2004); see Celotex Corp., 477 U.S. at 322–25. Further, the holder of an insurance policy has the burden of proof to show that his or her claim falls within the scope of an insurance policy. Furrow v. State Farm Mut. Auto. Ins. Co., 375 S.E.2d 738, 740 (Va. 1989) (citing Maryland Cas. Co. v. Cole, 158 S.E. 873, 876 (Va. 1931)); see also Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 636 (4th Cir. 2005) (applying Virginia law). An insurer, on the other hand, bears the burden of establishing that an exclusion in the policy applies to bar coverage of a claim. Transcon. Ins. Co. v. RBMW, Inc., 551 S.E.2d 313, 318 (Va. 2001) (quoting Am. Reliance Ins. Co. v. Mitchell, 385 S.E.2d 583, 585 (Va. 1989)). These burdens remain with the policyholder and insurer, respectively, even when the insurer initiates an action for declaratory judgment. See Johnson v. Ins. Co. of N. Am., 350 S.E.2d 616, 619 (Va. 1986) (stating, in a declaratory judgment action, that the insurer has the burden to prove that an exclusion applies); Rainwater Concrete Co., Inc. v. Cardinal Concrete Co., Inc., 17 Va. Cir. 325, 1989 WL 646394 at *2 (Va. Cir. Ct. Oct. 6, 1989) (citing Reasor v. City of Norfolk, 606 F. Supp. 788, 793 (E.D. Va. 1984)) ("In an action for declaratory judgment, the burden of proof is not put on the plaintiff merely because he has filed the action. Rather, the Court must examine the underlying issues to determine who bears the burden of proof.").

## V. Analysis

In its Complaint for Declaratory Judgment, State Farm asserts that there is an actual controversy regarding its own obligations and the obligations of Nationwide with respect to the

August 17, 2008 fire. Doc. 1 at 4. State Farm seeks declaratory judgment that it has no obligation to defend Robins or itself against any action by Farm Bureau arising out of the fire. Similarly, Nationwide in its Answer asks the Court to declare that it is not obligated to defend or indemnify Robins for any claim arising from the fire, and that State Farm alone is obligated to defend and indemnify Robins. Because the parties have stipulated all of the relevant facts, the Court need only decide whether State Farm and/or Nationwide are entitled to judgment as a matter of law.

The parties' motions for summary judgment present two issues: (1) whether the damage to Ivey's property resulted from the ownership, maintenance, or use of Robin's box van; and (2) whether the damage to Ivey's property is excluded from coverage under Nationwide's policy as property damage arising out of Robins' operations. In analyzing these issues, the Court must consider several basic principles that govern the interpretation of insurance contracts in Virginia. "[C]onsideration must be given to the intention of the parties to the insurance agreement in determining the scope of the coverage afforded." State Farm Mut. Auto. Ins. Co. v. Powell, 318 S.E.2d 393, 397 (Va. 1984). "Ownership, maintenance, or use" provisions should be "construed in the light of the subject matter with which the parties are dealing; the terms of the policy should be given their natural and ordinary meaning." Id. Stated differently, "the intended meaning of the provision may be discerned only by construing the words in light of the context in which they appear, that is, in an automobile insurance policy providing coverage for injuries arising out of the use of the vehicle," or in a commercial general liability policy providing coverage for insurable but not business risks. Doe v. State Farm Fire & Cas. Co., 878 F. Supp. 862, 864 (E.D. Va. 1995); see Mid-Continent Cas. Co. v. JHP Dev., Inc., 557 F.3d 207 (5th Cir. 2009) (citing Robert J. Franco, Insurance Coverage for Faulty Workmanship Claims Under Commercial

General Liability Policies, 30 Tort & Ins. L.J. 785, 785 (1995) ("[C]ommercial general liability insurance policies cover only 'insurable risks' and exclude business risks.")). Further, exclusionary language in an insurance policy is to be construed most strongly against the insurer. Transcon., 551 S.E.2d at 318 (quoting Am. Reliance, 385 S.E.2d at 585). One final principle—that "consideration must be given to what the injured person was doing when he was injured, as well as his purpose and intent, in determining whether that person was in such position in relation to the vehicle to be injured in its 'use,'" Powell, 318 S.E.2d at 397—is less applicable here, as the relevant harm is property damage rather than personal injury.

### A. Ownership, Maintenance, or Use

The State Farm insurance policy covers "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and <u>resulting from the ownership, maintenance or use of</u>" the box van. Doc. 22, Ex. 9, Form 9846BA, Section II, ¶ A; id. Form 6090WW.4, ¶ A (emphasis added). Nationwide's insurance policy, on the other hand, excludes coverage for "'[b]odily injury' or 'property damage' <u>arising out of the ownership, maintenance, use</u> or entrustment to others of any . . . 'auto' . . . . Use includes operation and 'loading or unloading.'" Id. Ex. 6, Bates No. NTWD000102, ¶ g. Thus, under State Farm's policy the property damage—not the accident that caused the property damage—must result from the ownership, maintenance, or use of the box van, and under Nationwide's policy the property damage is excluded from coverage if it arises out of Robins' ownership or use of the van. Also, while Robins technically has the burden to show that State Farm's policy covers the property damage at issue, the parties have not sought default judgment against Robins and have communicated to the Court that this dispute is between the three named insurers. Nevertheless, because the State Farm and Nationwide policies each use

the "ownership, maintenance, or use" language, such that if coverage exists under one policy it does not exist under the other, and because Nationwide also has a burden to show that its exclusionary "ownership, maintenance or use" clause applies to the damage at issue, the competing viewpoints in the dispute have been sufficiently briefed to allow the Court to make a decision. Predictably, State Farm claims that the fire did not "result[] from the ownership, maintenance, or use of" the van and therefore argues that it has no liability, see Doc. 24, while Nationwide argues that the fire did arise out of the ownership, maintenance, or use of the van, and therefore argues that it has no liability, see Doc. 27.

As a factual matter, the three reports that analyze the cause of the fire are in agreement that the fire originated in the back of the van. Id. Ex. 3, Section 5.0; id. Ex. 4 at 5; id. Ex. 5 at 4. None of the reports concludes that the van itself caused the fire. Id. Ex. 3, Section 5.0; id. Ex. 4 at 5; id. Ex. 5 at 4. The parties stipulated that the van had been parked on Ivey's property for approximately one (1) month before the fire,[2] and that at the time of the fire the van was parked and locked. Doc. 22 at 4.

### 1. Ownership and Employment of the Vehicle as a Vehicle

Nationwide contends that the van would not have been on site if Robins had not owned it. Nationwide further argues that because the van itself was the fuel that allowed the fire to grow and eventually consume the Ivey home, any liability arising out of the fire is excluded from coverage under the Nationwide policy as arising out of the ownership of a vehicle. Thus, the first issue to address is whether this dispute can be decided based solely on the fact of Robins' ownership of the van.

---

[2] Although not explicitly stipulated, the pictures accompanying the three expert reports show that the box van was parked immediately in front of the front porch of the Ivey home.

Few cases throughout the United States, and none in Virginia, address whether an accident resulted from the ownership of a vehicle. In South Dakota, the ownership provision is used as the basis for negligent entrustment lawsuits, but such cases do not inform the present analysis. See, e.g., Estate of Trobaugh ex rel. Trobaugh v. Farmers Ins. Exch., 623 N.W.2d 497, 504 (S.D. 2001). In Texas, a court refused to find that a firearm accident arose out of the ownership of a vehicle even if the accident did not arise out of the vehicle's use, because the litigant who urged that finding "d[id] not point to any cases giving the term 'ownership' such independent meaning. 'The term "use" is the general catchall of the insuring clause, designed and construed to include all proper uses of the vehicle not falling within other terms of definition such as ownership and maintenance.'" Mid Century Ins. Co. of Texas v. Lindsey, 942 S.W.2d 140, 144 (Tex. App. 1997) (quoting State Farm Mut. Auto. Ins. Co. v. Pan Am Ins. Co., 437 S.W.2d 542, 545 (Tex. 1969)). This language suggests that some vehicle uses fall into the ownership category, some uses fall into the maintenance category, and "all proper uses . . . not falling" within those two categories are covered by the use category. In other words, no liability can be incurred due to ownership of a vehicle unless the vehicle is being used in some way.

Virginia courts might agree with this proposition, as the Virginia Supreme Court has stated that "[e]ven though ownership, maintenance, or use of the vehicle need not be the direct, proximate cause of the injury in the strict legal sense, nevertheless, there must be a causal relationship between the accident and <u>employment of the insured motor vehicle as a vehicle</u>." Powell, 318 S.E.2d at 397 (emphasis added) (citations omitted) (explaining how automobile liability policies should be interpreted).[3] Subsequent cases have echoed this "as a vehicle"

---

[3] Although the court in Powell was specifically addressing the interpretation of automobile insurance policies, the "as a vehicle" limitation has been applied at least once when interpreting a general commercial liability policy, see Fed. Ins. Co, 415 F. Supp. 2d at 654, and there is no indication that the Powell principles should not be used when interpreting such policies.

limitation, which remains binding law in Virginia.[4] See, e.g., Fed. Ins. Co. v. New Coal Co., Inc., 415 F. Supp. 2d 647 (W.D. Va. 2006); Slagle v. Hartford Ins. Co. of the Midwest, 594 S.E.2d 582, 586 (Va. 2004); Lexie v. State Farm Mut. Auto. Ins. Co., 469 S.E.2d 61, 64 (Va. 1996); State Farm Mut. Auto. Ins. Co. v. Rice, 391 S.E.2d 71, 72 (Va. 1990); Firemen's Fund Ins. Co. v. Sleigh, 2003 WL 1246213 (Va. Cir. Ct. Feb. 6, 2003). See also Doe, 878 F. Supp. at 864–65 & nn.7–8 (noting that this principle, which has been reaffirmed by the Virginia Supreme Court, is applicable Virginia law, and also explaining that it "follows logically from a common sense inquiry into the probable intent of the parties" to an automobile liability policy).

Because of the Powell requirement that there be a causal relationship between the accident and employment of the insured motor vehicle as a vehicle, which applies regardless of whether property damage is alleged to result from the vehicle's ownership, maintenance, or use, for all practical purposes the issue of use must be decided whether or not the issue of ownership is addressed. In other words, the Court will have to determine whether there is a causal relationship between the accident and employment of the insured vehicle as a vehicle, and that inquiry necessarily includes an inquiry into whether the vehicle was being employed, or used. If a causal relationship is found—meaning that use has also been found—then there would be little reason to also address ownership.[5] In sum, even though Robins owned the van and the van was the fuel that allowed the fire to grow large enough to spread to the Ivey home, the Court must still determine whether there is a causal relationship between the accident and employment of the van as a vehicle before it can determine whether there is coverage under the State Farm or Nationwide policies.

---

[4] Virginia is not alone in requiring that the use be "as a vehicle." See, e.g., Lincoln Gen. Ins. Co. v. Aisha's Learning Ctr., 468 F.3d 857, 859 (5th Cir. 2006) ("Further, the use required is of the vehicle qua vehicle, rather than simply as an article of property." (internal quotation marks omitted) (citation omitted)).

[5] This may explain why there are no Virginia cases addressing whether bodily injury or property damage resulted from vehicle ownership.

## 2. Causal Relationship

In light of the above discussion, the next issue to be addressed is whether there was in fact a causal relationship between the damage to Ivey's home and employment of the box van as a vehicle. As no one disputes that the fire spread from the van to the house, the only real question is whether the box van was being used as a vehicle at the time of the fire. This inquiry "does not lend itself to resolution by strict guidelines or a set formula." Slagle, 594 S.E.2d at 586.

The parties have cited a number of cases in urging the Court to adopt their respective positions. Among the cases that have found the requisite causal relationship lacking are Powell, Erie Insurance Co. v. Jones, 448 S.E.2d 655, 658–59 (Va. 1994), and Doe. The Powell Court found that a truck was being used as a gathering place rather than as a vehicle when a gun inside the truck discharged unexpectedly, killing a bystander. Powell, 318 S.E.2d at 394–98. Jones involved an individual who exited his vehicle at an intersection, removed a rifle, and tapped the rifle on the window of a nearby car; the rifle discharged and a passenger in the car was killed. Jones, 448 S.E.2d at 656. The court in Jones determined that the vehicle was only related to the passenger's death by a chronological sequence of events, and therefore the insurance policy was not implicated. Id. at 659. Finally, in Doe a woman was forced into a car, driven to a secluded spot, and sexually assaulted. Doe, 878 F. Supp. at 868–69. In holding that there was no causal relationship between her injuries and the employment of the vehicle as a vehicle, the Doe Court explained that the woman could have been assaulted anywhere, and that even though the car had been used to transport her to a different location, the car as a vehicle was unrelated to her actual injuries, which occurred during the assault and not while she was being transported. Id.

Other cases have found a causal relationship in various circumstances. Injuries sustained by an individual who was hit by a car while guiding a tractor trailer as it backed into position next to a busy road were held to be causally related to the use of the tractor-trailer in Slagle, because the rig could only achieve its intended use as a cargo vehicle if it could be correctly positioned. Slagle, 594 S.E.2d at 587. Similarly, in Nationwide Mutual Insurance Co. v. Smelser, 563 S.E.2d 760 (2002), the Virginia Supreme Court held that "the ordinary movement of a vehicle . . . was the direct cause, rather than a mere incidental aspect, of the injuries sustained" by an elderly pedestrian where a passenger in the passing vehicle grabbed the pedestrian's purse strap such that she was dragged next to the vehicle for approximately ten (10) feet. Id. at 763. Finally, the court in State Farm Mutual Automobile Insurance Co. v. Rice, 391 S.E.2d 71 (Va. 1990), held that injuries caused by the accidental discharge of a rifle were causally related to the use of a vehicle because the rifle was being unloaded from the vehicle when it fired. Id. at 73.

Unfortunately, most of these cases provide little guidance to the Court in resolving the present dispute; none of them are factually similar to the situation at hand, and the result in each is largely fact-specific. However, the approach taken by the court in Powell is instructive, and when applied here that approach suggests that there is a causal relationship resulting from the employment of the box van as a vehicle, such that the State Farm policy does cover the damage to the Ivey home.

In finding that the automobile insurance policy at issue in Powell was not implicated by the facts of that case, the Powell Court noted that the vehicle at issue was classified as a private passenger automobile for use as a farm utility vehicle. Powell, 318 S.E.2d at 397. The vehicle had been modified by its owner, who had installed a gun rack. Id. The court stated "There is no

evidence that the truck manufacturer provided a place for installation of such a rack so as to charge the insurer with notice that such a device probably would be installed by the owner." Id. The court then noted that at the time of the accident the vehicle was not being employed "for any specific enterprise usually associated with use of a passenger, farm utility vehicle." Id. at 398. Finally, the court explained that the injured party had no association with the vehicle prior to his death—he had not been a passenger in the vehicle and did not intend to become an occupant thereof. Id.

Here, the insured vehicle was a box van, specifically built with a cargo space intended to hold cargo. State Farm was therefore on notice, from the moment it agreed to insure the vehicle, that the van would be used to hold foreign objects within its cargo space. Unlike the situation in Powell, where at the time of the accident the farm utility vehicle was being used as a situs for a social gathering rather than for anything typically associated with use as a farm vehicle, here the van was being used for its intended purpose—to hold foreign objects within its cargo space. Because part of using a cargo vehicle is loading or unloading the cargo, and because cargo is most efficiently loaded or unloaded when the distance over which it must be carried is minimized, parking the van close to the Ivey home was also use of the box van as a vehicle, and State Farm was or should have been on notice that the van would be parked close to buildings from the time it agreed to insure the vehicle. The only aspect of Robins' use of the van that may have departed from use of a box van as a vehicle was his practice of leaving the van on site through the duration of his involvement with a particular project.[6] However, the length of time for which the van was parked on the Ivey property had nothing to do with the accident here; rather, the accident resulted from Robins' use of the van to store his tools and materials, and

---

[6] There has been no evidence presented as to whether it is unusual to leave a box van at a worksite for an extended period of time; therefore, the Court has no basis to decide the issue.

13

because the van was parked close enough to the house to allow a fire in the van to spread to the house. Both of these aspects of Robins' use fall within the use of a box van as a vehicle; indeed, a similar accident could have occurred if a loaded box van had been left at a loading dock over a weekend or even overnight.

In sum, the van was being used as a vehicle when, as the evidence shows, something in the box van's storage space sparked a fire that subsequently spread from the van to the house. Accordingly, the Court **FINDS** that there was a causal relationship between Robins' employment of the box van as a vehicle and the property damage to Ivey's home. Based on this finding, the Court also **FINDS** that the property damage resulted from the ownership or use of the box van such that the vehicle was insured under the State Farm policy, as Nationwide claims, and such that the property damage is excluded from coverage under the Nationwide policy.

### B. The Nationwide j(5) Exclusion

While the above findings are sufficient to dispose of this dispute, Nationwide has also asked the Court for summary judgment that the property damage at issue is excluded from coverage by a second exclusion within its policy. This second exclusion applies to property damage to "[t]hat particular part of real property on which [Robins] . . . [was] performing operations, if the 'property damage' [arose] out of those operations." Doc. 22, Ex. 6, Bates No. NTWD000103, ¶ j(5) (the "j(5) exclusion"). As before, the burden of establishing the exclusion's applicability rests on Nationwide.

#### 1. "That Particular Part of Real Property"

Nationwide argues that Robins was hired to work on the doors, windows, and baseboards throughout the house, and that the house as a whole is therefore the "particular part of real property" on which Robins was performing operations for purposes of the j(5) exclusion. Doc.

27 at 6–7. For support, Nationwide looks to William Crawford, Inc. v. Travelers Insurance Co., 838 F. Supp. 157 (S.D.N.Y. 1993), where in the course of renovating an apartment a contractor used electric fans to circulate humidified air. Id. at 158. One of the fans caught fire, resulting in fire damage to a limited area of the apartment and smoke damage throughout the apartment and in other areas of the apartment building. Id. In a subsequent suit between the contractor and his insurer, with an identically-worded exclusion at issue, the court held that damage to the entire apartment was excluded under the insurance provision because it arose out of the contractor's operations. Id. at 158–59. Similarly, in Jet Line Services, Inc. v. American Employers Insurance Co., 537 N.E.2d 107 (Mass. 1989), the court held that the same exclusion applied to damage to an entire petroleum storage tank, even though work was only being performed on the bottom of the tank.

Farm Bureau and Ivey respond that the words "that particular part of real property" in the j(5) exclusion limit applicability of the exclusion to the specific property on which Robins was working—"interior doors, trim around the windows, baseboards, molding, stairways, etc." Doc. 30 at 3 (citing Doc. 22, Ex. 1 (Robins Deposition) at 8–9). While the "that particular part of real property" phrase is quoted in the two cases they cite, Mid-Continent and American States Insurance Co. v. Powers, 262 F. Supp. 2d 1245 (D. Kan. 2003), neither of these cases supports the interpretation of the phrase urged by Farm Bureau and Ivey.

### 2. "Performing Operations"

Nationwide further argues that the j(5) exclusion applies even though Robins was not present or working at the time the fire broke out. Doc. 27 at 8. On this point Nationwide turns to Advance Electric, Inc. v. United States Fidelity and Guarantee Co., 818 F.2d 378 (5th Cir. 1987). There, Advance Electric had been hired to repair an electric motor, which required heating

certain components of the motor under a tarpaulin, allowing the components to cool, and then removing the tarpaulin. Id. at 378. During the cooling stage, and while no Advance Electric personnel were on site, the tarpaulin caught fire. Id. Interpreting an exclusion with similar wording to the j(5) exclusion, the court held that the damage occurred while operations were being performed, and was therefore excluded from coverage. Id. at 379. Nationwide also cites a Tenth Circuit case in which an identical exclusion was held to apply to damage that was caused by the insured's subcontractor, but was not discovered until after the subcontractor had left the site. Advantage Homebuilding, LLC v. Maryland Cas. Co., 470 F.3d 1003, 1010–11 (10th Cir. 2006). However, Advantage Homebuilding does not address whether operations are ongoing during a weekend pause in active work.

One other case discussed by the parties bears some relevance to this issue. The court in Mid-Continent was asked to decide whether the plaintiff insurance company was liable for property damage that occurred after the defendant construction company had completely stopped working on the property, but before the work was completed. Mid-Continent, 557 F.3d at 210. The property damage resulted from the defendant's failure to properly waterproof the condominiums it was building. Id. Applying Texas law and evaluating an identically-worded j(5) exclusion, the Fifth Circuit remarked that "[t]he ordinary meaning of 'performing operations' is the active performance of work." Id. at 213. The appellate court went on to explain:

> This was not merely a brief, temporary halt, such as that which might occur at the conclusion of each workday or during several days of inclement weather, but rather a total cessation of active construction work for the foreseeable future. Although [defendant] intended to eventually complete construction work once the units were sold, an actor is not actively performing a task simply because he has not yet completed it but plans to do so at some point in the future.

16

Id. Nationwide has suggested that the first sentence of the above quotation shows that operations continue even though physical activity on a project may stop overnight or for a few days, and that the j(5) exclusion still applies to damage that occurs during such temporary halts. Doc. 35 at 2. However, the Mid-Continent court was not deciding—and was not asked to decide—whether a temporary halt in active work is sufficient to render the j(5) exclusion inapplicable; rather, it used the distinction between such temporary halts and the complete cessation of activities that actually occurred in the case before it to emphasize that "operations" had unquestionably ceased in that case. The second sentence of the above quotation, as well as the court's definition of "performing operations," both support the conclusion that even a temporary halt in the active performance of work renders the j(5) exclusion inapplicable for the duration of the pause. There is no question that no active performance of work was occurring at the time of the fire at the Ivey property.

### 3. "If the Property Damage Arises out of Those Operations"

While Nationwide, Farm Bureau, and Ivey each focused their briefs on whether Robins was performing operations when the fire occurred, and on whether the entire house can be considered the particular piece of real property on which he was performing those operations, no party adequately addressed the final clause in the j(5) exclusion. That clause states that the exclusion only applies "if the 'property damage' arises out of [the insured's] operations." Doc. 22, Ex. 6, Bates No. NTWD000103, ¶ j(5).

In those cases where the j(5) exclusion has been found to apply, the property damage has clearly arisen out of the operations of the insured individual or company. In William Crawford, a fan that the insured had positioned and turned on so as to accomplish the task he was hired to complete caught fire and caused the damage. William Crawford, 838 F. Supp. at 158. In Jet

Line Services, the petroleum tank exploded while it was being cleaned by the insured, less than a year after another petroleum tank had exploded while being cleaned by the same company. Jet Line Servs., 537 N.E.2d at 111–12. In Advance Electric, the tarpaulin caught fire during the requisite cooling stage of the repair process, which proceeded even though no company personnel were at the site. Advance Elec., 818 F.2d at 378–79. And in Advantage Homebuilding, damage to the windows occurred while they were being installed by the subcontractor. Advantage Homebuilding, 470 F.3d at 1010–11. In each of these cases, the damage unquestionably arose out of the insured's operations—indeed, none of these insured individuals or companies could have completed their operations had they not initiated or performed the task that led to the eventual damage.

In the instant case, however, the only relationship between the fire and Robins' operations is that the fire occurred inside the box van that Robins was using to store his equipment. The fire did not arise out of anything that Robins had done in furtherance of the trim work he had been hired to do, nor did it occur while he was doing that work or while that work was progressing in his absence. Thus, even if Robins' operations were ongoing at the time of the fire, Nationwide has not established that the fire arose out of Robins' operations, as required for the j(5) exclusion to apply.

For the reasons set forth above, the Court **FINDS** that the damage to Ivey's property is not excluded from coverage under the j(5) exclusion to the Nationwide policy.

## VI. CONCLUSION

Having **FOUND** that the damage sustained by Ivey's property resulted from the ownership or use of Robins' box van, such that the vehicle was insured under the State Farm policy, the Court **GRANTS** Nationwide's Motion for Summary Judgment, Doc. 26, to the extent

that it asks the Court to find that the property damage arose out of the ownership or use of the van, and the Court **DENIES** State Farm's Motion for Summary Judgment, Doc. 23. Having also **FOUND** that the j(5) exclusion in Nationwide's policy does not exclude coverage for the damage to Ivey's property, the Court **DENIES** the remainder of Nationwide's motion.

The Clerk is **REQUESTED** to send a copy of this order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, VA
Date: January 28, 2010